IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,<br><br>Plaintiff,<br><br>v.<br><br>EAGLEPICHER TECHNOLOGIES, LLC,<br><br>Defendant. | Case No. 3:14-cv-05057-MDH |

## ORDER

Before the Court are cross motions for summary judgment. After full and careful consideration, the Court hereby **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Summary Judgment (Doc. 38) and **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment (Doc. 37).

### I. BACKGROUND

Plaintiff Union brings the present action against Defendant Company pursuant to Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185. Plaintiff alleges Defendant breached the terms of the parties' implied-in-fact contract by refusing to arbitrate grievances and by terminating Dave Jackson and Peggy Johnson without proper cause. Plaintiff asks the Court to enter a judgment declaring Defendant breached its obligations under the labor contract and ordering either arbitration of the grievances or reinstatement of the employees. Defendant argues the Court lacks jurisdiction to hear this case because no agreement existed between the parties such that Section 301 of the LMRA applies. Defendant further

argues that, even assuming a contract did exist, the contract did not contain an arbitration clause because the former arbitration clause expired when the former CBA expired and the Company has consistently disavowed any duty to arbitrate since then.

## II. STANDARD

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). The moving party bears the burden of showing there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III. DISCUSSION

Because the facts in this case are largely undisputed, the question before the Court is whether either party is entitled to judgment as a matter of law. In examining the undisputed material facts, the Court finds the parties intended the unilaterally implemented LBFO to serve as an "interim agreement." The interim agreement, however, does not require the parties to arbitrate the grievances at issue. While the arbitration clause included in the LBFO was not expressly excluded prior to its implementation, the Company's words and actions following implementation and prior to the terminations of Jackson and Johnson consistently manifested

intent to disavow any duty to arbitrate. Whether the employees at issue were terminated for "proper cause" as required by the interim agreement involves questions of fact and credibility that are reserved for the factfinder at trial.

## A. Undisputed Material Facts

Defendant ("Company") operates a manufacturing plant in Joplin, Missouri that produces batteries and stored power solutions for complex military and aerospace products, including missiles and aircraft. Plaintiff ("Union") is a labor organization that acts as the collective bargaining representative for a bargaining unit that consists of hourly production and maintenance workers at Defendant's facilities in Joplin, Missouri. Plaintiff oversees a local union, Local Union 812L, which acts on behalf of Plaintiff in day-to-day representation of the bargaining unit employees.

The Union[1] and Company entered into a series of collective bargaining agreements between 1967 and 2008. The most recent collective bargaining agreement ("CBA") expired on May 2, 2008. That agreement included, among other provisions, a provision requiring "proper cause" to terminate employees and a provision requiring arbitration at the final step of the grievance procedure. Prior to the expiration of the CBA, Company and Union representatives met and attempted to negotiate a successor agreement. On or about April 28, 2008, the Company presented its "Last, Best, and Final Offer" ("LBFO") to the Union.[2] The Union presented the Company's LBFO to its members and the members overwhelmingly voted to reject the LBFO and authorized a strike. The parties continued to negotiate after May 2, 2008 but were

---

[1] Both the Union and its predecessors.

[2] The LBFO altered some terms of the parties' former CBA but did not omit or substantively change the provisions requiring proper cause to terminate employees and providing arbitration at the final stage of the grievance procedure.

3

unable to reach a mutually acceptable agreement. On May 28, 2008, the Company advised the Union that effective June 2, 2008, the Company would unilaterally implement the terms of its April 28, 2008 LBFO with the exception of certain non-implementable terms.[3] Shortly after the terms were implemented, the Union filed an unfair labor practice charge with the NLRB, arguing the Company violated the LMRA by unilaterally implementing terms prior to bargaining to an impasse. The NLRB found no basis for the Union's charge and refused to issue a complaint.

The parties agree that since 2008 there has been no signed, written agreement governing the relationship between the parties. The Union never officially agreed to the terms of the LBFO but union employees have continued to work under the terms of the implemented LBFO for the past seven years without striking. During that time period, the Union has always retained the ability to strike, although it agreed to provide a 24-hour notice to the Company in the event of a strike. The Company, similarly, has continued to operate under the terms of the unilaterally implemented LBFO but it has consistently refused to arbitrate grievances. The Union filed an unfair labor practice charge against the Company in 2009 based on the Company's refusal to arbitrate grievances at the final step of the grievance procedure; the NLRB dismissed the charge after finding no violation of the LMRA. The again parties met in 2011, 2012, and 2013 to attempt to negotiate a new CBA but were unsuccessful.

In January of 2014, employees David Jackson and Peggy Johnson were terminated for violating workplace rules that prohibit taking food into the "dry room" environment in which they work.[4] Both employees were aware of the rules regarding food and drink in the dry room,

---

[3] The terms deemed non-implementable were the Management Rights Clause, the No Strikes Clause, and the proposed Past Practice Clause.

[4] Jackson was also allegedly observed loafing and stealing time by not working and reading the newspaper for long periods of time.

4

although they argue those rules were inconsistently enforced, and both had been previously disciplined for violations of the same or similar rules. At the time of their terminations, Jackson served as the Vice President of Local 812L and Johnson served as a union steward. The Union filed grievances on behalf of Jackson and Johnson, arguing their terminations were improper because the rules regarding food in the dry room were inconsistently enforced. The Company denied both grievances and refused to arbitrate at the final stage of the grievance procedure.

### B. Legal Analysis

The legal arguments furthered by the parties concern three issues: (1) whether there was an agreement in place at the time the grievances arose such that the Court has jurisdiction to hear this case under LMRA Section 301; (2) whether a valid arbitration agreement existed between the parties at the time the grievances arose such that Defendant should be compelled to arbitrate the grievances; and (3) whether Jackson and Johnson were terminated for proper cause.

### 1. An "interim" agreement existed such that the Court has jurisdiction under Section 301.

LMRA Section 301 provides federal jurisdiction for "[s]uits for violation of contracts between an employer and a labor organization representing employees[.]" 29 U.S.C. § 185(a). Jurisdiction under Section 301 is "not limited to formal CBAs" but instead "provides a forum for any 'agreement between employers and labor organizations significant to the maintenance of labor peace between them.'" *United Paperworkers Int'l Union, AFL-CIO, Local 274 v. Champion Int'l Corp.*, 81 F.3d 798, 802 (8th Cir. 1996) (quoting *Retail Clerks Int'l Assoc., Local Unions Nos. 128 & 633 v. Lion Dry Goods, Inc.*, 369 U.S. 17, 28 (1962)).

An expired CBA generally does not provide Section 301 jurisdiction for post-expiration

claims,[5] nor do employment terms and conditions that were unilaterally implemented after the CBA expired and the parties bargained to impasse.[6] *Id.*; *see also Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190, 206 (1991). Section 301 jurisdiction does lie, however, where the evidence shows the parties were operating under an "interim agreement" to preserve labor peace:

> When a CBA has been terminated, the parties have bargained to an impasse, and the employer has unilaterally implemented all or part of its final offer, § 301 jurisdiction will lie to enforce any "interim" agreement that the employer and union may reach to preserve labor peace until a new CBA can be negotiated.

*Champion*, 81 F.3d at 802.

In the Eighth Circuit, "proof of an interim agreement requires not only evidence of the employer's intent to make an offer, but also evidence of the union's intent to accept that offer over and above the fact that union members continued to work." *Id.* at 803. The evidence of offer and acceptance need not be formal or even express, but it must "must relate to the union-employer bargaining relationship to prove that a § 301 contract was formed." *Id.* Thus, "the fact that the employer announced unilateral changes is not sufficient evidence of an interim agreement offer" and "the fact that the employees continued to work is not sufficient evidence of union intent to accept an offered interim agreement." *Id.* at 803-04. Nonetheless, the Eighth Circuit has recognized that "courts may legitimately 'stretch' to find interim agreements because such agreements further the federal policy of labor peace." *Id.* at 804.

---

[5] As noted by the Supreme Court, the expired CBA may nonetheless retain legal significance because "most terms and conditions of employment are not subject to unilateral change, in order to protect the statutory right to bargain[.]" *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.,* 501 U.S. 190, 206 (1991). While the expired CBA's terms no longer have force by virtue of the contract, they may provide a basis for an unfair labor practice filed with the NLRB. *Id.* at 206-07.

[6] An employer's non-compliance with its unilaterally implemented terms generally "may be enforced, but not under § 301, and not under state law, which is preempted . . . non-compliance may be remedied only by the NLRB[.]" *Id.*

6

Case law illustrates that courts require minimal evidence to find the existence of an interim agreement. *See, e.g., id.* (sufficient evidence to find interim agreement where company unilaterally implemented terms to head off impending strike, union representative responded "I could live with that" when company offered to post notice stating most former terms remained in effect, and employees continued to work under posted terms); *Beck v. Gannett Satellite Informational Network, Inc.*, 124 F. App'x 311, 320 (6th Cir. 2005) (interim agreement where company unilaterally implemented terms and employees continued to work and utilized grievance procedures under unilaterally imposed terms); *McNealy v. Caterpillar, Inc*., 139 F.3d 1113, 1122 (7th Cir. 1998) (interim agreement where employer unilaterally implemented terms and employees recessed strike and returned to work); *United Paperworkers Int'l Union v. Int'l Paper Co.*, 920 F.2d 852, 857-58 (11th Cir. 1991) (interim agreement where company unilaterally implemented terms, employees continue to work, and union agreed not to strike without providing a ten-day notice).[7]

Here, the undisputed evidence shows an interim agreement existed between the parties at the time the grievances arose. In 2008, shortly after the Union members overwhelmingly voted to reject the LBFO and authorized a strike, the Company advised it would unilaterally implement the terms of the LBFO with certain exclusions. The timing and circumstances surrounding the unilateral implementation of the LBFO manifest the Company's intention to make "an offer of an interim agreement to lessen employee unrest and avoid a strike." *See Champion*, 81 F.3d at

---

[7] By contrast, the cases where courts find no interim agreement typically involve affirmative conduct by the union manifesting rejection of the offer to enter into an interim agreement. *See, e.g., Int'l Union, United Mine Workers of Am. v. Big Horn Coal Co.*, 916 F.2d 1499, 1502 (10th Cir. 1990) (no interim agreement where employees engaged in a seven-month long strike three months after employer unilaterally implemented terms); *Local Union 813, Int'l Bhd. of Teamsters v. Waste Mgmt. of NY, LLC*, 469 F. Supp. 2d 80, 85 (E.D.N.Y. 2007) (no interim agreement where union sanctioned strike four months after company unilaterally implemented its best final offer); *Local 15, Int'l Bhd. of Elec. Workers v. Midwest Generation EME, LLC*, 284 F. Supp. 2d 1005, 1007-08 (N.D. Ill. 2003) (even assuming employer made offer for interim agreement, no acceptance occurred because union chose to strike).

804. Thus, the Court finds a valid offer to enter into an interim agreement. The evidence further shows the Union manifested acceptance of that offer by continuing to work under the implemented LBFO for seven years without striking, agreeing to provide 24-hour notice in the event of a strike, and acting in accordance with the terms and conditions of the unilaterally implemented LBFO, for example, by utilizing grievance procedures. *See Beck*, 124 F. App'x at 320; *United Paperworkers*, 920 F.2d at 857-58. In other words, the Union also chose to accept the terms of the LBFO as a temporary, stop-gap measure "rather than taking more hostile action." *See Champion*, 81 F.3d at 804. Because both parties manifested intent to enter into an interim agreement to preserve labor peace until a new CBA could be reached, the Court has jurisdiction to hear Plaintiff's dispute under Section 301.[8]

**2. The parties did not have a valid arbitration agreement at the time the grievances arose.**

Arbitration is a matter of contract. *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). While there is a strong federal policy favoring arbitration of labor disputes, "[t]he law compels a party to submit his grievance to arbitration only if he has contracted to do so." *Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 374 (1974); *see also* 29 U.S.C. § 173(d). "[U]nder the NLRA arbitration is a matter of consent . . . it

---

[8] Defendant argues the Union rejected its offer of an interim agreement because the evidence shows: (1) the Union filed an unfair labor charge shortly after the LBFO was implemented, and (2) the Union retained its ability to strike. These arguments are unavailing. First, Plaintiff's unfair labor charge argued only that Defendant failed to bargain to impasse prior to unilaterally implementing its LBFO. The fact that Plaintiff disputed the parties were at an impasse does not show Plaintiff was unwilling to accept the LBFO as a temporary, stop-gap measure following impasse. *See Beck*, 124 F. App'x at 314-15, 319-20. Moreover, once the NLRB issued its decision finding the parties were at impasse, Plaintiff took no action to otherwise manifest rejection of the offer; to the contrary, Plaintiff chose not to strike and acted in compliance with the terms of the LBFO for seven years. Second, that the Union retained the ability to strike does not negate the evidence of acceptance in the record, especially considering the Union chose not to use that "economic weapon" when the LBFO was unilaterally implemented or at any time within the seven years since. *See Champion*, 81 F.3d at 804 (sufficient to find acceptance where employees manifest intent to accept and chose to forego taking more hostile action); *McNealy*, 139 F.3d at 1122 (suspension of strike without agreement not to strike in future was sufficient evidence of acceptance); *Aircraft Braking Sys. Corp. v. Local 856, Int'l Union, United Auto, Aerospace & Agr. Implement Workers*, 52 F.3d 324 (6th Cir. 1995) (unpub.) (that employees chose not to strike was evidence of acceptance despite no formal agreement not to strike).

8

will not be imposed on parties beyond the scope of their agreement." *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190, 201 (1991). Citing these principles, the Supreme Court has held that an arbitration clause contained in an expired CBA is not effective to bind the parties absent an agreement to continue that clause. *Id.* at 206-07 (1991). Appellate courts have held that an interim agreement can effectively "continue" an arbitration clause where the parties manifest intent to include the expired arbitration clause in their implemented terms. *See, e.g., United Paperworkers*, 920 F.2d at 857-58; *Luden's Inc. v. Local Union No. 6 of Bakery, Confectionery & Tobacco Workers' Int'l Union of Am.*, 28 F.3d 347, 354-64 (3d Cir. 1994).

In the present case, the Company's LBFO included an agreement to submit unresolved grievances to arbitration.[9] The Company did not expressly exclude that provision when it unilaterally implemented its terms.[10] Although the Company did expressly exclude other provisions from its implemented offer – i.e. the Management Rights Clause, the No Strikes Clause, and the Past Practice Clause – it did not expressly exclude the arbitration clause. This evidence tends to indicate the Company's implemented offer included an arbitration clause. *See, e.g., Paperworkers*, 920 F.2d at 856-57; *cf. McNealy*, 139 F.3d at 1115. The Union accepted the Company's implemented offer, including the arbitration clause, through its conduct following unilateral implementation. *See Maxwell Macmillan Co. v. Dist. 65, UAW*, 790 F. Supp. 484, 486

---

[9] The written document entitled "Implemented Terms and Conditions" constitutes the only evidence of the Company's LBFO and it includes grievance procedures that require arbitration at Step Four. *See* Pl's Amended Complaint, Ex. 2 at 12-13. The notes from contract negotiations similarly reveal an arbitration agreement at Step Four of the grievance procedure. *See* Def's Sugg. Supp. Summ. J., Ex. H at 28-29.

[10] The letter notifying the Union of implementation of the LBFO states:

> Accordingly, please be advised that the Company presently intends to implement its Company LBFO on or after June 2, 2008. Of course, the Company will not implement its proposed changes in the Management Rights Clause, the No Strike Clause, and the proposed "Past Practice" Clause, which under Board law, cannot be unilaterally implemented. *Otherwise the Company intends to implement its entire Company LBFO*, either on or after June 2, 2008.

Pl's Am. Compl. Ex. 1 at 2 (emphasis added).

(S.D.N.Y. 1992) (quoting *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1510 (7th Cir. 1991) (the union "might accept the offer, arbitration clause and all, by conduct rather than by express words[.]"). Thus, it appears the parties' interim agreement initially encompassed an agreement to arbitrate.

However, the Company's conduct since implementation clearly manifests the Company's intent to exclude arbitration from the parties' interim agreement. It is undisputed that the Company has consistently refused to arbitrate all grievances since 2008. The evidence shows that, in May of 2009, the Union requested arbitration of three grievances but the grievances were never arbitrated. The evidence further shows that, in July of 2009, the Union requested arbitration of two additional grievances but the Company refused to arbitrate both, providing rejection letters stating "given the fact that no replacement CBA has yet been reached, the 'arbitration' provision of the CBA is no longer in effect. . . . Therefore, the Company does not agree to arbitrate this grievance." *See* Def's Sugg. Supp. Summ. J., Exs. E-3 and E-4. The Union filed an unfair labor practice charge against the Company in 2009 for its refusal to arbitrate but the Board found no violation under the Act.[11] Following the Board's decision, the Union exhibited no hostile action toward the Company and continued to operate under the terms of the interim agreement, including the grievance procedure. The parties met in 2011, 2012, and

---

[11] As a matter of background, prior to impasse, an employer violates Section 8(a)(5) of the Act if it unilaterally institutes changes to any mandatory subject of bargaining. *See NLRB v. Katz*, 369 U.S. 736, 743 (1962). After impasse, however, an employer can legally implement unilateral changes so long as those changes were reasonably comprehended within pre-impasse proposals and consistent with the offers rejected by the union. *NLRB v. McClatchy Newspapers, Inc*., 964 F.2d 1153, 1165 (D.C. Cir. 1992); *see also N.L.R.B. v. Plainville Ready Mix Concrete Co*., 44 F.3d 1320, 1326 (6th Cir. 1995). In 1991, the Supreme Court ruled that arbitration clauses are not subject to the *Katz* prohibition on unilateral changes. 501 U.S. 190, 200-201 (1991). Thus, an employer can unilaterally revoke an agreement to arbitrate any time after expiration of the CBA. As the Court noted, if the parties favor post-expiration arbitration of disputes, "the parties can consent to that arrangement by explicit agreement" or "a collective-bargaining agreement might be drafted so as to eliminate any hiatus between expiration of the old and execution of the new agreement, or to remain in effect until the parties bargain to impasse." *Id.* at 201.

2013 but there is no evidence to suggest the Union demanded arbitration of grievances or that the parties came to any subsequent agreement regarding the arbitration of grievances.

The Company's actions since expiration of the prior CBA show a clear intent to disavow any agreement to arbitrate grievances. Even assuming the parties' interim agreement initially included an arbitration clause, the Company's actions and words since 2009 exhibit unequivocal intent to revoke such a provision. *See Luden's*, 28 F.3d at 359 (3d Cir. 1994) ("Either party may renege on the term at any time by clearly disavowing – whether by word, pen, or deed – the arbitration provision of the implied-in-fact CBA. Of course, repudiation would affect only *future* disputes arising after such notice[.]"); *see also United Paperworkers Int'l Union, AFL-CIO, Local 274 v. Champion Int'l Corp.*, 81 F.3d 798, 804 (8th Cir. 1996) (finding sufficient evidence to show a "*terminable-at-will* interim agreement" (emphasis added)); *Aircraft Braking Sys. Corp. v. Local 856, Int'l Union, United Auto, Aerospace & Agr. Implement Workers*, 52 F.3d 324 n. 4 (6th Cir. 1995) (unpublished table decision) (quoting *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v. Randall Div. of Textron, Inc.*, 5 F.3d 224, 229 (7th Cir. 1993)) ("A labor contract of indefinite duration or one that does not specify a time or manner of termination is terminable at the will of either party upon reasonable notice to the other party.").

After the Company refused arbitration in 2009 and the NLRB found no violation of the LMRA, union members continued to work and the Union took no hostile action towards the Company based on its refusal to arbitrate. The Union further continued to invoke the grievance procedures under the implemented terms. The conduct of the Union implies continued acceptance of the interim agreement despite the Company's disavowal of the arbitration clause. *See Luden's*, 28 F.3d at 357 ("Had Luden's demonstrably disavowed that provision, the union

11

employees could have consciously chosen whether or not to continue working diligently for their employer (that is, they could have elected, based on their employer's decision to refuse arbitration, whether to quit, strike, engage in a boycott, work slow-down, or work stoppage, or to continue to execute their job responsibilities faithfully).").

Based on the foregoing, the Court finds the Union had no reason to expect arbitration of grievances after 2009. Had the Union filed suit in 2009 seeking to compel arbitration, the Court may have come to a different conclusion; however, by the time the grievances at issue in this case arose, the Company had refused to arbitrate grievances consistently for nearly five years. Additionally, had the Union presented some evidence that the Company's position on arbitration was inconsistent, that interim agreement was somehow invalid after removal of the arbitration clause, or that the Union negotiated new terms reviving the arbitration clause, the Court may have come to a different conclusion; however, no such evidence is before the Court. Accordingly, the Court finds the parties' interim agreement did not include a valid agreement to arbitrate grievances.

### 3. Whether the employees were terminated for "proper cause" is an issue for trial.

Although the parties' interim agreement does not include a duty to arbitrate grievances, it clearly requires "proper cause" for terminating employees. The proper cause requirement was included in the Company's LBFO, it was not removed from the terms of the implemented offer, and it was not otherwise disavowed by either party. The relevant provision states: "An employee's employment shall be terminated and the employee shall thereby lose all seniority in the event that: (1) The employee quits or is discharged for proper cause and such discharge is not reversed through the grievance . . . procedure as set forth in this Agreement." *See* Pl's Amended Complaint, Ex. 2 at 5. The implemented terms do not define the phrase "proper cause."

12

The Court finds the issue of proper cause in this case is not appropriate for summary judgment. The parties dispute a material fact related to the employees' terminations – specifically, whether the rules under which Jackson and Johnson were terminated were inconsistently enforced. That fact may affect whether the union employees had sufficient notice of the rule(s) such that punishment was "proper" and, if so, whether termination was the "proper" punishment given the circumstances. To make this determination, the factfinder will need to assess credibility of the witnesses and review all the relevant evidence. Accordingly, the Court will not grant summary judgment to either party on the issue of proper cause and will instead reserve that issue for trial.

## IV. DECISION

In accordance with the above discussion, the Court hereby **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Summary Judgment and **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment. Plaintiff is granted summary judgment on the issue of jurisdiction and Defendant is granted summary judgment on the issue of arbitration. The issue of proper cause is reserved for trial. The parties previously stipulated to a two-day bench trial. The parties are hereby **ORDERED** to confer regarding the anticipated length and date(s) of trial and to file a notice to the Court regarding the same within fourteen (14) days of the date of this Order.

**IT IS SO ORDERED:**
Dated: July 23, 2015

                                           */s/ Douglas Harpool*
                                           **DOUGLAS HARPOOL**
                                           **UNITED STATES DISTRICT JUDGE**