# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHWESTERN DIVISION

| | |
|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC, <br><br> Plaintiff, <br><br> v. <br><br> EAGLEPICHER TECHNOLOGIES, LLC, <br><br> Defendant. | Case No. 3:14-cv-05057-MDH |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

The Court held a bench trial in this matter on January 21, 2016. Following the presentation of evidence, the Court left the record open to accommodate the videotaped deposition of defense witness Douglas Hamel. The Court ordered the parties to submit their closing arguments through written submissions and to brief the legal issues presented. Upon review of the trial record as a whole, the Court hereby enters the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

1. Defendant EaglePicher Technologies, LLC ("EaglePicher" or "Company") operates a manufacturing facility in Joplin, Missouri that produces specialty batteries for military and other use. Trial Tr. 5, 10, 14, 105; Hamel Tr. 9; Doc. 51, at 3.

2. Prior to April 11, 2016, Plaintiff United Steel, Paper and Forestry Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("Union") represented a bargaining unit of approximately 200 hourly production and

maintenance employees at the Company's facility on "C" and Porter Streets in Joplin, Missouri. Trial Tr. 40; Hamel Tr. 7.[1]

3.  David Jackson was employed by EaglePicher in the bargaining unit at the Joplin facility from June 1981 until his termination in January 2014. Trial Tr. 51. For his last 14 years at EaglePicher, Jackson was a group leader over parts fabrication and worked in the dry room where batteries were assembled. Trial Tr. 58-59. Jackson was Vice President of Local 812L for approximately six years prior to his termination. Trial Tr. 60; Hamel Tr. 32.

4.  Peggy Johnson was employed by EaglePicher in the bargaining unit at the Joplin facility from 1986 until her termination in January 2014. Trial Tr. 97. Johnson worked in the dry room for most of her time at EaglePicher, and she was a parts fabricator for her last 10-12 years. Trial Tr. 98. Johnson was a Union steward for at least 15 years prior to her termination. Trial Tr. 100.

5.  Teresa Buckmaster has been employed in the bargaining unit at the Joplin facility for 36 years. Tr. 13. She has worked in the dry room and her current position requires her to visit the dry room several times a day. Tr. 14-15. Buckmaster has been president of Local 812L since 2008. Tr. 16.

6.  Douglas Hamel worked for EaglePicher in Human Resources for approximately 11 years and was the Company's Human Resources Director from 2010 to 2014 (the highest ranking HR position and responsible for eight or nine EPT facilities in the U.S. and Canada). Hamel Tr. 6-7.

---

[1] On April 1, 2016, the employees voted in an election conducted by the National Labor Relations Board ("NLRB") against continuing representation by the Union. Doc. 71-1. No objections to the election were filed, and on April 11, 2016, the NLRB's Regional Director certified the results formally ending the Union's representation of the employees at the facility. Doc. 71-2.

7. The most recent collective bargaining agreement between the Company and the Union expired on May 2, 2008 but the Court found the Union's acceptance of terms and conditions unilaterally implemented by the Company after bargaining to impasse created an interim agreement such that the Court has jurisdiction under Section 301 of the Labor Management Relationship Act of 1947. Doc. 51, at 3, 7-8. The Court found the interim agreement does not require arbitration of grievances but does require proper cause for discipline or discharge. Doc. 51, at 9-12.

8. Some of the Company's operations are conducted in "dry room" facilities where humidity is maintained at less than 1% to prevent adverse reactions with lithium and other chemicals used in the manufacturing process. Hamel Tr. 27.

9. The Company has long had a rule prohibiting eating or drinking in the "dry room" operations where certain battery products are assembled. Hamel Tr. 8-9; Trial Tr. 6, 32, 75.

10. Lithium, which is used in the dry room, is highly flammable and can start a fire if it comes into contact with liquids. Hamel Tr. 8.

11. Food can cause contamination of batteries, and eating or drinking in the dry room can be a safety hazard if chemicals used in the production process were to be ingested. Hamel Tr. 8-9.

12. Signs posted outside the dry room prohibit liquids in the dry room but <u>do not</u> mention a prohibition of food. Trial Tr. 16, 105.

13. Supervisors are responsible for training hourly employees working in the dry room regarding the rules of food and drink. Hamel Tr. 27.

14. In 2009, disciplinary actions were initiated against both Jackson and Johnson and they were disciplined for eating and drinking in the dry room. Trial Tr. 33, 71, 75, 90-91, 101.

3

The company initially determined they were to be suspended for three days each, but the Union grieved the suspensions. The grievances were settled by the company with an agreement to reduce the discipline from a suspension to a written warning. Trial Tr. 33, 71, 101; Hamel Tr. 33-34. The settlement agreement states that "[t]he Company and the Union agree that it is a serious violation of Company rules, and extremely dangerous for any employee to bring any <u>liquids</u> (emphasis added) into any of the Company's dry rooms" and "any violation of <u>this</u> rule is serious misconduct, which will subject an employee who violates the rule to severe disciplinary action, up to and including termination of employment." Def. Ex. 1. The settlement makes no mention of eating in the dry room, and includes no discussion of eating in the dry room as a hazard, or any disciplinary consequence of eating in the dry room.

15. At some point between 2009 and 2014, bargaining unit employee Jake Tillman was suspended three days for drinking soda pop in the dry room. Trial Tr. 35; Hamel Tr. 11.

16. Between approximately 2009 and 2014, there was a community candy jar in the dry room that employees, including supervisors, would take candy from and eat. Supervisors would hand out bags of candy in the dry room around holidays and employees would open the bags and eat the candy in the dry room. Trial Tr. 65-68, 70,72, 82, 91-92, 102-103.

17. Supervisors of the dry room instructed employees to hide the community candy jar during an audit but would permit the employees to bring the candy jar back after completion of the audit. Trial Tr. 67-68.

18. Supervisors regularly ate food in their offices adjacent to the dry room, but not in the dry room itself.

19. On at least a couple of occasions, dry room employees ate in the dry room without being disciplined.

20. In January 2014, management received a report that Jackson and Johnson had been eating in the dry room. Hamel Tr. 15.

21. Human Resources Director Douglas Hamel then talked to other individuals in the dry room and looked at the video from the security cameras in the dry room. Hamel Tr. 15. According to Teresa Buckmaster, the video cameras installed in the dry room were to be used for security purposes only. Trial Tr. 51-52.

22. After reviewing the video, Hamel asked Jackson whether he had been eating in the dry room and Jackson stated that he had. Hamel asked him whether other employees had been eating in that area and he refused to answer. Trial Tr. 45, 62-63, 85-86, 104; Hamel Tr. 16.

23. After reviewing the video, Hamel asked Johnson if she had been eating in the dry room and she stated that she had not. Hamel asked her if she observed anyone else eating in the dry room and she refused to answer. Trial Tr. 45, 108-09; Hamel Tr. 16-17.

24. No evidence was presented indicating either Jackson or Johnson had been drinking liquids in the dry room in January 2014.

25. No evidence was presented concerning the amount of time Johnson or Jackson allegedly sat idle at their work stations or the discipline imposed for such an alleged work violation.

26. Neither Jackson nor Johnson was ever given the opportunity to explain or respond to issues surrounding their alleged idleness.

27. Hamel did not ask Jackson or Johnson whether or why they were sitting idle at their work stations. Trial Tr. 63, 78-79, 89, 92-93, 104; Hamel Tr. 39.

28. The Company suspended Jackson and Johnson pending investigation and, after approximately two weeks, terminated them. Trial Tr. 63, 103-04, 109; Hamel Tr. 35.

29. Jackson's termination letter stated that he "consumed food in an unauthorized work area, falsified company records, and breached the company's trust by fraud, theft, and dishonest behavior," although only the food violation had been mentioned to Jackson during the investigation. Ex. D3; Trial Tr. 89, 92-93.

30. Jackson testified he had "no idea" what records he allegedly falsified or what fraud, theft, or dishonest behavior he engaged in other than reading the newspaper. Trial Tr. 92-93. Hamel testified that the statement "breached the company's trust by fraud, theft, and dishonest behavior" refers to the "theft of time" because Mr. Jackson was seen reading a newspaper and not working while at work. Hamel Tr. 36-37.

31. Down time is common in the dry room when employees are waiting for an earlier production stage to finish. It is not always practical to do other work during this time, and Jackson was never instructed to do anything else while waiting. Trial Tr. 89-90; Hamel Tr. 37.

32. Although both Jackson and Johnson received other various and miscellaneous disciplines over the years, these prior disciplinary issues were not considered in the decision to terminate Jackson and Johnson. Hamel Tr. 50-53.

33. Jackson has been employed at Schreiber since August of 2015. Trial Tr. 56. Johnson worked a second job at Kohl's at the time she was terminated from EaglePicher and she continued working at Kohl's after her termination. Trial Tr. 97.

## II. CONCLUSIONS OF LAW

1. The parties have an implied-in-fact contract that includes a requirement of proper cause to discharge an employee whose labor organization is a party to the contract. This contract includes a provision that the termination of an employee must be for "proper cause." Doc. 51, at 3, 7-8, 12.

6

2. Section 301 of the Labor Management Relations Act authorizes suits for breach of contracts between a labor organization and an employer. *Groves v. Ring Screw Works*, 498 U.S. 168, 172 (1990) (citing 29 U.S.C. § 185(a)).

3. The Court's finding that an implied-in-fact contract exists provides this Court with jurisdiction, under Section 301 of the LMRA, to determine the merits of whether proper cause existed to discharge Jackson and Johnson. *United Paperworkers Int'l Union v. Champion Int'l Corp.*, 81 F.3d 798, 802 (8th Cir. 1996) (stating that section 301 "jurisdiction will lie to enforce any 'interim' agreement that the employer and union may reach to preserve labor peace until a new CBA can be negotiated."). Doc. 51, at 6-8.

4. The Court is not bound to rely on the methods of labor arbitrators to interpret the meaning of "proper cause," or any synonym for that term. However, the Court takes into account the persuasive and practical value of these methods.[2]

5. By the very nature of the words used, terms like "proper cause," "good cause," and "just cause" imply an element of fairness. It is not enough that the discharge result from the objective truth that the rule or policy was technically violated.

6. "Proper Cause," "Good Cause," or "Just Cause" requires that the employee must have had notice that the rule not only existed, but that a certain degree of discipline could result from its violation.

7. The rule must be reasonably related to the operation of the employer's business, and it must be reasonable to expect employees to conform to that rule.

---

[2] The tests formulated by Arbitrator Carrol Daugherty are of particular value. In the 1960s, Arbitrator Daugherty outlined seven tests to determine whether proper cause existed to punish or terminate an employee. Those tests, and the notes that accompany them, may be found at *Enterprise Wire Co.*, 46 LA 359 (Daugherty 1966).

7

8. The employer must perform a fair investigation to determine whether the employee violated the rule. This includes informing the employee of the charge. A proper investigation allows an employee to explain themselves and rebut any allegations of wrongdoing.

9. The evidence that the employee violated the rule must be sufficient to allow a reasonable person to conclude that, based on the evidence, the employee did, in fact, violate the rule.

10. An employer must enforce the rule evenhandedly and consistently. The employer's failure to be consistent in the rule's application casts the shadow of discrimination on the process and the decision to punish the employee.

11. The punishment must be commensurate with the proven violation. Except in cases involving very serious violations, when immediate discharge would be warranted, the employee's record of service should be taken into account.

12. David Jackson was fired for two stated reasons: (1) consuming food in an unauthorized area, and; (2) falsifying company records and breaching the company's trust by fraud, theft, and dishonest behavior. Findings of Fact, ¶ 29.

13. The only reason for Peggy Johnson's termination that is present within the record is that Johnson was consuming food in an unauthorized area. It is unclear whether Johnson was also terminated for falsifying company records or breaching the company's trust by fraud, theft, and dishonest behavior. Findings of Fact, ¶ 23-28.

14. Neither basis supports a finding of "proper cause" for terminating either Jackson or Johnson.

15. The charge of falsifying company records and breaching the company's trust by fraud, theft, and dishonest behavior is related to an accusation of idleness. According to the

testimony of Mr. Hamel, the basis of the charge was Mr. Jackson reading a newspaper instead of performing work tasks. Findings of Fact, ¶ 30.

16. Mr. Jackson was not informed of this charge against him, nor was he provided the opportunity to dispute the charge or explain himself. The Union was similarly not informed of this charge.

17. The failure to inform the employee or the Union of the idleness charge against him violates the element of fairness that is part of "proper cause." The employee was denied the opportunity to rebut the accusations levelled against him or to explain himself. The employee was, in effect, denied the process that was due to him, which acts as a safeguard to ensure that discipline is warranted.

18. Furthermore, the failure to inform the employee of the charge against him brings the propriety of the degree of punishment into question. Termination is an extreme punishment. Reading a newspaper does not constitute the form of misconduct that normally justifies immediate termination. The Court cannot find proper cause exists to terminate an employee for allegedly reading a newspaper when they were not given the opportunity to dispute that charge.[3]

19. The charge that Jackson and Johnson were eating in the dry room similarly fails to support a finding of "proper cause" for termination. Although a longstanding rule against eating and drinking in the dry room existed within the Company, neither employee had sufficient notice of the potential for punishment by termination for eating only. No other employee had ever been terminated for eating in the dry room. The sign outside of the dry room only prohibited liquids. The supervisors were responsible for training employees regarding the rules for the dry room. By enabling the consumption of food in the dry room, the supervisors condoned and encouraged the

---

[3] Although the record does not clearly reflect whether Ms. Johnson was terminated for idleness, the Court nonetheless applies this same reasoning. If the Company terminated Ms. Johnson for idleness, she was similarly denied the opportunity to rebut the accusations or explain her actions.

9

behavior. Any distinction between eating candy and other food in the dry room was not clearly articulated. Employees cannot justifiably be terminated for violating a rule that the actions of their own supervisors encouraged them to violate. Findings of Fact, ¶ 9-13, 16-17.

20.     The Company argues that both employees had been disciplined under this rule previously, and that this prior discipline served as notice. That argument is not supported by the record. The prior discipline as amended was <u>solely</u> for consuming liquids in the dry room. The warning issued related solely to consumption of liquids. Thus, this incident does not qualify as a second violation of the rule, nor does the earlier discipline serve to put the employees on notice that they may be terminated for eating (as opposed to drinking) in the dry room. Findings of Fact, ¶ 14. The risks associated with drinking in the dry room are different than those associated with eating.

21.     For these reasons, the employees were not on reasonable notice that they risked termination by eating in the dry room.

22.     Additionally, the punishment is not commensurate with the violation. A first-time violation of a poorly-enforced rule does not justify termination. Termination is an excessive and unreasonable punishment for a rule that had never been enforced against an employee, especially when supervisors were aware of the behavior, did nothing to discourage it, and in fact, themselves handed out candy to be consumed in the dry room.

23.     The non-existent enforcement of the rule – and its violation by supervisors – combined with the drastic punishment, precludes a finding by the Court that proper cause existed to terminate David Jackson and Peggy Johnson.

24.     Furthermore, although termination may have been an appropriate punishment for an employee guilty of two separate rules violations, such as repeated consumption of liquids, the

10

Case 3:14-cv-05057-MDH   Document 77   Filed 09/30/16   Page 10 of 11

severe flaws in the termination process regarding both allegations of wrongdoing – idleness and eating in the dry room – prevent the Court from concluding that the two violations, together, provide "proper cause" to terminate either Jackson or Johnson. Two fundamentally flawed charges of rules violations cannot, in this case, be combined to create proper cause.

25. The Court finds David Jackson and Peggy Johnson were terminated without just or proper cause. Therefore, the Court finds, by a preponderance of the evidence, that Defendant breached the provision of the implied-in-fact contract requiring all terminations to be for proper cause.

### III. CONCLUSION

**WHEREFORE,** the Court finds in favor of Plaintiff and against Defendant on the Complaint and finds Peggy Johnson and David Jackson were terminated by Defendant without just cause. The Court enters Judgment in favor of Plaintiff and against Defendant on the issue of the propriety of the termination of Peggy Johnson and David Jackson. However, the Court record includes inadequate information regarding possible orders of remedial action based on the terminations. The Court does not believe the current record is adequate for the Court to adequately address those issues in this Order. The Court will schedule an additional evidentiary hearing to address the issues of back pay, reinstatement, future losses, other damages or remedial actions. Defendant's Motion to Supplement The Record [Doc. 71] will be taken up and considered at the evidentiary hearing.

**IT IS SO ORDERED.**

DATED: September 30, 2016

                                                         */s/ Douglas Harpool*
                                                        **DOUGLAS HARPOOL**
                                                        **UNITED STATES DISTRICT JUDGE**